# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**JUDITH WILLIAMS,**

 **Plaintiff,**

 v.

              Civil Action 2:14-cv-2655
              Judge Michael H. Watson
              Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

 **Defendant.**

## REPORT AND RECOMMENDATION

 Plaintiff, Judith Williams, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 19), Plaintiff's Reply (ECF No. 20) and the administrative record (ECF No. 11). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## I. BACKGROUND

 Plaintiff protectively filed her application for Disability Insurance Benefits and Supplemental Security Income on January 23, 2012, alleging an onset date of October 2, 2011. Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo*

hearing before an administrative law judge.  Administrative Law Judge John Dowling ("ALJ") held a hearing on June 11, 2013, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 31–67.)  On June 28, 2013, the ALJ issued his decision, finding that Plaintiff was not disabled as contemplated under the Social Security Act.  (R. at 16–25.)  On October 23, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

In her Statement of Errors, Plaintiff advances two errors.  Plaintiff first asserts that remand is required because the administrative law judge erroneously failed to consider the side effects of her medications in assessing her residual functional capacity.  Plaintiff next asserts that the ALJ failed to properly evaluate whether she was disabled under Listings 12.03 and 12.06.  More specifically, Plaintiff maintains that the ALJ should have concluded that she has marked limitations in social functioning and in her activities of daily living and that she experienced three, not two, episodes of decompensation.  The Undersigned limits her discussion to evidence bearing on these contentions of error.

**A.    Relevant Medical Records**

Plaintiff was admitted to Riverside Methodist Hospital on November 18, 2011, and discharged the following day.  (R. at 363.)  She was diagnosed with a mood disorder and a fever.  She was prescribed Prozac instructed to follow up with a community medicine clinic in two-to-three weeks.

On December 8, 2011, Plaintiff was seen at Netcare and released.  (R. 412).  During that visit, Plaintiff reported that her depression and mood swings began approximately a year prior following a miscarriage.  (R. at 415).  On December 10, 2011, Plaintiff was assessed at Netcare

and involuntarily admitted to Twin Valley Behavioral Health ("TVBH") due to psychosis and the inability to care for herself. (R. at 426.) Plaintiff was unable to participate in the Netcare assessment and only minimally able to communicate. She was observed to be staring off into the distance. Plaintiff's mother reported that she had demonstrated an impaired mental status and exhibited a "catatonic-like stare." (R. at 423–24.) She also reported that in the period preceding the hospitalization, Plaintiff exhibited a very poor ability to engage in self-care activities, appeared to be preoccupied, giggled to herself, did not sleep well, was becoming increasingly moody, and was exhibiting disorganized behaviors such as screaming in the streets and standing unclothed for periods of time. (R. at 373.)

Plaintiff remained at TVBH for twelve days. She was started on the medication Risperdal for treatment of apparent catatonic-type psychosis. (R. at 374.) She exhibited "very significant deficits in functioning over the first few days of her hospitalization." (*Id.*) Her Risperdal was eventually increased to 4 mg per day. A substance abuse assessment revealed that Plaintiff reported using cannabis on a regular basis in significant amounts.

Plaintiff's discharge summary notes reflect that "[b]y December 19, [2011,] [she] had made remarkable improvement." (R. at 375.) Plaintiff stated that she was "feeling a lot better" and denied hallucinations. (*Id.*) Plaintiff also reported "tolerating the medication well." (*Id.*) Plaintiff was discharged on December 23, 2011, following an assessment for discharge readiness. (R. at 375). At that time, Plaintiff's "mental status was relatively normal overall with no major findings in terms of any changes in psychomotor status, thinking, or cognition." (R. at 375–76.) Plaintiff's discharge diagnoses were identified as schizophrenia, catatonic type, partial remission; and cannabis dependence.

Following discharge, Plaintiff treated with a mental health provider through March 2012. (R. at 382–87 (monthly office visits from December 2011 through March 15, 2012).) The treatment notes reflect that Plaintiff was stable and doing well.

On June 17, 2012, Plaintiff was brought to Netcare by Columbus Police Department officers who stated that Plaintiff had contacted them for assistance because she was schizophrenic and wanted to harm herself. (R. at 432–33). Plaintiff reported being off of her medications since February 2012 and was seeking readmission to TVBH. (R. at 433.) Plaintiff was observed to be "entertaining internal stimuli" and appeared "disorganized, confused, delusional, and manic." (*Id*.) It was also noted that Plaintiff had a more than five-year history of marijuana abuse, admitted heavy marijuana use, and had last smoked marijuana in June 2012. The Netcare clinician assessed that Plaintiff was exhibiting psychotic symptoms due to "being off her medications and a [history] of cannabis abuse." (*Id*.) It was recommended that Plaintiff be evaluated by a doctor at TVBH. On June 18, 2012, the TVBH physician noted that Plaintiff had been noncompliant with her medication since February 2012 without a specific reason. (R. at 438.) Plaintiff reported that she had been using marijuana daily. Plaintiff also reported that she had tolerated her medication well with no side effects. (*Id*.) On June 19, 2012, Plaintiff was discharged as her mental status had stabilized with Risperdal. (R. at 450). She was described as goal oriented, alert and oriented, and as having euthymic mood and full affect. (R. at 451.) She was instructed to remain compliant with medication (3mg of Risperdal and 50mg Vistaril) and refrain from drugs and alcohol. Plaintiff's diagnoses at time of discharge were schizophrenia paranoid type and cannabis abuse. (R. at 452.) At a follow-up appointment with Netcare on

June 21, 2012, Plaintiff reported feeling better and it was noted that she was tolerating her medications with no side effects. (R. at 467.)

Plaintiff voluntarily returned to Netcare on July 5, 2012, after seeking treatment from Ohio State Medical Center Emergency Room the day before. (R. at 456). She reported that despite being prescribed only 3 mg of Risperdal per day, she had been taking up to 16 mg of Risperdal per day because "the generic didn't seem to be working," which caused her to run out of her medication. (R. at 457.) Plaintiff reported that the medication she obtained at Ohio State Medical Center helped her and that she had not heard any voices since 5:00 p.m. the prior evening. Plaintiff also indicated that she had last used cannabis on June 17, 2012, but it was noted that this representation "may or may not be true" given that marijuana was found on a screen performed on July 4, 2012. (R. at 476.) On July 6, 2012, Plaintiff reported no side effects with her medications with the exception of not sleeping well. (R. at 477.) Plaintiff was discharged on July 13, 2012, and noted to have a stable mental status and observed to be goal oriented, alert and oriented with normal perceptions and euthymic mood. (R. at 469.)

Plaintiff maintained regular monthly appointments with doctors at Columbus Area, Inc. from July 2012 through February 2013. (R. at 496–506). At her July 2012, appointment, Plaintiff reported feeling well and denied side effects from her medications. (R. at 505.) At her August 2012 visit, Plaintiff complained of drooling and feeling slow. (R. at 504). The clinician observed that Plaintiff appeared "brighter" and was smiling and that she reported no depression or anxiety. (R. at 503.) In October 2012, Plaintiff reported feeling "down in the dumps" and unable to think, and of restlessness or stiffness in her legs. (R. at 501.) She was observed to be feeling stable, thinking clearly, and showing insight. (*Id.*) It was also noted that she was able to

5

take care of her basic needs and that she was reading better. (*Id.*) In November 2012, Plaintiff reported that her mood was stable, but that her thoughts were fuzzy. (R. at 500.) In December 2012, the doctor noted that Plaintiff's mood was stable and that her affect was appropriate. Plaintiff reported that she was experiencing some restless legs symptoms, but her thinking was "fairly clear." (R. at 499.) In January 2013, Plaintiff reported that her thoughts were more clear. (R. at 498.)

### B.     Opinion Evidence

On September 25, 2012, state-agency consultant Bruce Goldsmith, Ph.D., reviewed Plaintiff's records and opined that her medical impairments did not satisfy Listing 12.03, which relates to schizophrenic, paranoid, and other psychotic disorders. He opined that Plaintiff had moderate restrictions in her activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace and that the record reflected that she had one or two episodes of decompensation of extended duration. (R. at 107–08.) He also opined that Plaintiff's allegations were only partially credible and inconsistent with the totality of the evidence. (R. at 109.) In terms of limitations, Dr. Goldsmith opined that Plaintiff could perform work that involved simple task instructions without fast pace with routine tasks and infrequent changes and that does not require more than superficial interaction with others. (R. at 109–10.)

### C.     Plaintiff's Hearing Testimony

At the June 11, 2013 administrative hearing, Plaintiff testified that she was recently married and living in a townhouse with her husband. She stated that she does not drive due to the side effects of her medications, which she said made "it a little difficult to stay focused on

the road."  (R. at 36.)  She identified her medications as Risperdal, Trazodone, and Cogentin. She said that in lieu of driving, her mother would take her places or she would use the bus.

Plaintiff indicated that she had graduated from high school and also cosmetology school. She last worked at a Wendy's restaurant in October 2011.  She said she stopped working because she was hearing voices.  Plaintiff stated that prior to her work at Wendy's, she also worked in housekeeping at a motel, as a hair stylist at a salon, and was in the military.

Plaintiff testified that she was diagnosed with schizophrenia in December 2011.  She says she feels frustrated, angry, scared, nervous, and anxious when her symptoms appear.  Plaintiff testified that the medication she took worked well for a while, but when she started taking more than prescribed, she had problems that prompted her doctor to reset her medication.  She also stated that smoking marijuana makes her symptoms worse.  She said that she stopped using marijuana when she was admitted to Netcare in June 2012.

Plaintiff stated that without medication, she experiences symptoms every day, but that with the medication, there is improvement.  She added that she recently started hearing voices again, which prompted her doctor to adjust her medications.  She said that her side effects included "restless legs and a couple of headaches here and there."  (R. at 46.)  Plaintiff stated that these side effects keep her from working because she is "tired all the time," she "can't really function or listen to clear directions," and it is "hard to really understand and concentrate on what [people are] actually saying."  (R. at 47.)

Plaintiff testified that it might take her longer to care for her personal needs, but that she could do it without help.  She indicated that she was stable from June 2012 until December 2012. She stated that she is getting progressively better, but that she is not yet ready to go back to

school or work. She explained that she sometimes still hears voices at night or in the morning. Plaintiff said that she would like to go back to school for massage therapy. She described a typical day as eating breakfast, getting on the computer, taking a nap, watching some television, and going back to sleep. She also walks and attends church.

**D.     The ALJ's Decision**

At step one of the sequential evaluation,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since alleged onset date of October 2, 2011, the alleged onset date of disability. At step two, the ALJ found that Plaintiff had the severe impairments of schizophrenia and cannibis abuse in remission. The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) In discussing

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

the Part B Listing Criteria, the ALJ found that Plaintiff had moderate restrictions in activities of daily living and social functioning.

    The ALJ analyzed Plaintiff's activities of daily living as follows:

> As for daily activities, [Plaintiff] testified that before she was prescribed psychotropic medication, her daily activities had started to decline. With medication, however, she is independent with self care and domestic chores, although she gets tired easily and tasks take twice as long to complete. [Plaintiff] lives with her husband, who helps her out with domestic chores and reminds her to take medication and relies on her mother or public transit for transportation. She likes to read daily but does not read as much as she used to because of concentration difficulties. She also goes to church once a month with her boyfriend and mother. [Plaintiff] wants to go back to school and study massage therapy when she feels fully improved. In short, [Plaintiff's] daily activities are affected by her mental illness, yet she appears capable of sustaining simple and routine tasks.
>
>     \*    \*    \*
>
> [Plaintiff] testified that her schizophrenic symptoms and the side effects of her psychotripic medications interfere with her ability to perform daily activities, including cooking, cleaning, and driving. At the same time [Plaintiff] is able to care for herself and use public transportation. Based on this information, I conclude that Plaintiff has moderate restriction in activities of daily living.

(R. at 20–21 (internal citations to the record omitted).)

    The ALJ analyzed Plaintiff's social functioning as follows:

> In social functioning, [Plaintiff] has moderate difficulties. She has indicated that she has limited social activities and that she re-experiences past trauma when she is around other people. [Plaintiff] also testified that she gets anxious and suspicious that people are out to get her when she has flare-ups of her symptoms. At the same time, treatment notes indicate that [Plaintiff] can be calm and pleasant when her symptoms are stable. [Plaintiff] has also reported that she uses public transportation and goes to church, which indicates that she is able to tolerate limited contact with others. Based on the above evidence, I conclude that [Plaintiff] has moderate limitations in social functioning.

(R. at 22 (internal citations to the record omitted).)

    The ALJ analyzed Plaintiff's episodes of decompensation as follows:

>As for episodes of decompensation, (R. at 20–21 (internal citations to the record omitted).) has experienced two episodes of decompensation of extended duration.  Episodes of decompensation are defined as exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  As discussed above, the claimant was hospitalized twice for extended periods of time—in December 2011 and in July 2012—because of deterioration in her symptoms.  Both times, she was stabilized with medication and discharged in significantly improved state.

(R. at 22–23 (internal citations to the record omitted).)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

>After careful consideration of the entire record, I find that [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: [Plaintiff] is limited to performing simple and routine tasks in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, with few, if any, workplace changes. [Plaintiff] should have only occasional interaction with the public, co-workers, and supervisors.

(R. at 19).  In formulating this RFC, the ALJ considered Plaintiff's testimony and the medical record and found that "the objective findings in this case fail to provide strong support for [Plaintiff's] allegations of disabling symptoms and limitations."  (R. at 21.)  The ALJ concluded that the opinion of the state-agency consultant was "reasonable in view of the improvement in [Plaintiff's] symptoms and functioning with prescribed medications" and assigned the opinion "great weight."  (R. at 23.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff is capable of performing her past relevant work as a housekeeper "as normally performed in the national economy and as actually performed."  (*Id*.)  The VE alternatively relied on the VE's testimony to conclude that Plaintiff can perform other jobs that exist in significant numbers in the state and national

10

economy. The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.

## II. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### III. ANALYSIS

**A.   The ALJ's Consideration of the Effects of Plaintiff's Medications**

As set forth above, within her first contention of error, Plaintiff contends that the ALJ failed to consider the type, dosage, effectiveness, and side effects of all of her medications. According to Plaintiff, the ALJ should have included her symptoms of drowsiness, fogginess, drooling, and restless leg and stiffness in his RFC finding. (Pl.'s Statement of Errors 9–10, ECF No. 14.) In her Reply, Plaintiff emphasizes the symptoms she endorsed during her hearing testimony, including her alleged exhaustion and cloudy mind. She maintains that the ALJ's RFC failed to account for her chronic fatigue and inability to concentrate, which she asserts render her incapable of performing even simple and routine tasks. (R. at 2.)

The Undersigned finds Plaintiff's first contention of error to be without merit. As Plaintiff correctly points out, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996). But contrary to Plaintiff's assertions, the ALJ did, in fact, consider her medications and their side effects. For example, the ALJ explicitly discussed Plaintiff's testimony that "the medication she takes for her symptoms makes her drowsy and tired and also interferes with her ability to concentrate." (R. at 20.) He also acknowledged her testimony that she was not to drive while on the medication. (*Id*.) The ALJ further noted her testimony that with medication, she was "independent with self-care and domestic chores" and that "she gets

12

tired easily and tasks take twice as long to complete." (R. at 20, 22.) He pointed out that her medical records reflected Plaintiff's reports that she was doing well on her medications and also that generally her medical records reflected that she was stable when she is fully compliant with her medications. (R. at 22.)

In addition, contrary to Plaintiff's apparent assertion in her Statement of Errors, the ALJ was not required to list all of her alleged symptoms into the RFC determination. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). Here, the ALJ properly considered Plaintiff's allegations of her symptoms and medication side effects and concluded that they were only partially credible, a determination which Plaintiff does not challenge. He then proceeded to consider all of the record evidence in assessing her RFC and ultimately concluded that Plaintiff could still perform simple and routine tasks in a work environment free of fast-paced production requirements involving only simple, work-related decisions, with few, if any, workplace changes where she had only occasional interaction with the public, co-workers, and supervisors. In addition, the ALJ offered discussion concerning how the record evidence supported his conclusions. The Undersigned finds no error with the ALJ's assessment of the record evidence in connection with his RFC determination.

Accordingly, it is **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

**B.     The ALJ's Consideration of Listings 12.03 and 12.06**

Plaintiff next submits that the ALJ failed to properly evaluate whether her mental impairments met of medically equaled Listings 12.03 and 12.06.

In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 404.1520(d). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."). *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The claimant shoulders the burden of producing medical evidence that establishes that all of the elements are satisfied. It is not sufficient to come to close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c).

Listing 12 addresses nine specific mental disorders. Every mental disorder addressed in the Listing includes *two* components, a diagnostic component, which consists of a description of the mental disorder; and a severity component, which consists of specific criteria measuring the

14

severity of the identified mental disorder.  *See* 20 C.F.R. pt. 404, Subpt. P, App. 1, 12.00(A)–(C) (West 2016).

Listing 12.03 addresses "schizophrenic, paranoid, and other psychotic disorders," and Listing 12.06 addresses "anxiety-related disorders."  20 C.F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.06 (West 2016).  To satisfy either of these Listings, Plaintiff must demonstrate that she satisfies both the "A" *and* "B" criteria or alternatively, that she satisfies the "C" criteria of the Listings.  Here, Plaintiff does not contend that she meets the requirements of paragraph C in either Listing, but instead that she satisfies the part "B" criteria.  Listings 12.03 and 12.06, like the other Listing 12 mental health listings, require a claimant to satisfy paragraph B criteria by showing marked impairment in at least two of the following:  (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *See* 20 C .F.R. Pt 404, Subpt. P, App. 1 §§ 12.03, 12.06 (West 2016).

According to Plaintiff, the ALJ erred in failing to find that she has marked limitations in social functioning and in her activities of daily living.  She also maintains that she experienced three, not two, episodes of decompensation.  The Undersigned finds Plaintiff's assertions to be without merit.

The criteria in paragraph B "describe[s] impairment-related functional limitations that are incompatible with the ability to do any gainful activity."  20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00(A) (West 2016).  The term "marked" as it is used under the criteria is not defined by specific quantitative threshold, but is instead evaluated "by the nature and overall degree of

15

interference with function." *Id.* at § 12.00(C) (West 2016). With regard to activities of daily living, the regulations provide as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

(*Id.*) For social functioning, the regulations provide as follows:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

(*Id.*) Finally, the regulations define the term "repeated episodes of decompensation, each of extended duration" to mean "three episodes within 1 year, or an average of once every 4 months, *each lasting for at least 2 weeks.*" *Id.* (emphasis added).

The Undersigned finds that the ALJ's determination that Plaintiff had only moderate restrictions in her activities of daily living to be supported by substantial evidence. As the ALJ pointed out, the record evidence reflects that with medication, Plaintiff was independent with her self care and domestic chores. (*See, e.g.*, Treatment Records, R. at 501 (noting that Plaintiff was able to take care of her basic needs and was reading); Plaintiff's Hearing Testimony, R. at 61-

16

67.)  She also testified that she was able to take public transportation, use a computer, and go to church.  (*Id.*)  Moreover, the ALJ's determination is consistent with Dr. Goldstein's conclusion that Plaintiff has only moderate restrictions in her activities of daily living.  (R. at 107–08.)

The Undersigned also finds that substantial evidence supports the ALJ's conclusion that Plaintiff had only moderate limitations in social functioning.  As the ALJ pointed out, the record reflects that Plaintiff is calm and pleasant when her symptoms are stable and that she at least superficially interacts with people when she uses public transportation and attends church.  And again, the ALJ's assessment is consistent with Dr. Goldstein's conclusion that Plaintiff has only moderate restrictions in maintaining social functioning.  (R. at 107–08.)

Although the foregoing findings are dispositive given that the Listings at issue require marked impairment in *two* areas, the Undersigned notes that the ALJ did not err in concluding that the record reflected only two episodes of decompensation of extended duration.  Plaintiff's contention that her one-day hospitalization in November 2011 qualified as a third episode ignores the regulation's requirement that to qualify as an episode of decompensation of *extended duration*, the episode must last "for at least two weeks."  Notably, Dr. Goldstein also concluded that Plaintiff had not demonstrated "repeated episodes of decompensation" as contemplated under the Listings.  (*Id.*)

In sum, the Undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff's impairments did not meet or equal a listed impairment.  It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## IV.  CONCLUSION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## V.  PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, he may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: January 28, 2016                                /s/ *Elizabeth A. Preston Deavers*
                                                     ELIZABETH A. PRESTON DEAVERS
                                                     UNITED STATES MAGISTRATE JUDGE